ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

CHRIS KALTSAS (NYBN 5460902)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Facsimile: (415) 436-7234
    Email: chris.kaltsas2@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 21-0257 EMC |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | |
| CRUZ CARRASCO VELASQUEZ, a/k/a "Mary Envios," | Hearing: May 17, 2023<br>Time: 2:30 P.M.<br>Judge: Hon. Edward M. Chen (Zoom) |
| Defendant. | |

### I. INTRODUCTION

On January 4, 2023, defendant Cruz Carrasco Velasquez (a/k/a "Mary Envios") (hereinafter, "the defendant") pled guilty to a single count of money laundering conspiracy in violation of Title 18, United States Code, Section 1956(h). Dkt. Nos. 42-43. The parties agree that the applicable Guideline range is 10-16 months' imprisonment in light of the defendant's criminal history and the value of the funds involved in the offense. The government respectfully submits that a custodial sentence at the low end of the Guidelines range is sufficient, but not more than necessary, to effectuate to goals of sentencing with respect to this particular defendant.

## II.     BACKGROUND

The defendant was a long-time owner of an operating money services business ("MSB") in the San Jose area. Presentence Investigation Report ("PSR") ¶ 6. As the owner of an MSB, the defendant contracted with various large companies such as Western Union, Ria, Sigue, and others to help effectuate transfers of money from her business location in San Jose to other MSBs around the world. *Id.* One of the defendant's clients and her co-conspirator, Jonathan Ponce, frequently used the defendant's services to launder the proceeds of his drug trafficking organization. The manner in which Ponce used the defendant's services clearly indicated that he was laundering the proceeds of a specified unlawful activity (i.e., drug trafficking). Ponce sent a number of third parties to conduct transactions at the defendant's place of business, and when he did so, he called the defendant before those third parties arrived to provide her with the names of transferors and transferees; the addresses of the counterparties to the transactions; and the specific locations to which funds should be sent. PSR ¶ 8. Ponce also told the defendant how much money to expect and when to expect it. *Id.* The defendant confirmed the details of these transfers with Ponce directly instead of the individuals who brought money to her location, because she knew that Ponce was directing every aspect of the transfers. PSR ¶ 9.

The defendant's own activities indicated that she knew that she was doing something wrong, but deliberately ignored what was happening to maintain her business. First, the defendant was required to provide addresses for some of the transferees to the larger companies for which she served as an agent, as a matter of anti-money laundering policy. Because Ponce did not provide that information to the defendant, she created addresses out of thin air, which was obvious from a simple search of the addresses the defendant provided to the larger MSB companies—few of the addresses actually existed, and some that did exist were for locations like parking structures, not residences. *Id.* Often, the defendant would use the same address numerous times and associated them with several different transferors. *Id.* The defendant did the same thing with respect to identification numbers from documents such driver's licenses; the numbers she recorded for numerous transactions were completely fabricated. PSR ¶¶ 8, 10. In some instances, the identification numbers were formatted completely incorrectly, indicating that the numbers were knowingly fabricated. In other instances, the numbers were formatted

correctly, but were not associated with any individuals. And in some other transactions, the numbers appeared to be associated with an individual different from the one who the defendant claimed was conducting the transaction. PSR ¶ 10. The defendant never obtained information from the individuals who used her services, either. PSR ¶ 8. That information would have included basic identifiers like the individual's name, address, and where the money should have been sent. *Id.* That activity clearly indicates that the defendant was attempting to conceal the identity of the true transferor at Ponce's behest.

The defendant also was advised, and advised others, that her activity raised concerns to the larger companies for which she was an agent, such as Western Union and Ria. PSR ¶ 11. These companies trained the defendant as to what sort of MSB activity is consistent with money laundering on multiple occasions, and in the course of her business, advised the defendant that she was engaging in behavior consistent with money laundering. *Id.* Many of those services terminated their business relationships with the defendant because of that activity, and informed the defendant of that business decision some time after her termination. *Id.* At one point, the defendant told Ponce that some of the services she used were better than others that were "delicate," *i.e.*, more inclined to exercise anti-money laundering oversight over the defendant's transactional activity. *Id.*

A grand jury returned an Indictment against the defendant on June 24, 2021. Dkt. No. 1. The Indictment charged the defendant with five substantive international money laundering counts, all in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i) (Counts One through Five); and one count of money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h) (Count Six). *Id.* The defendant pled guilty to Count Six of the Indictment, *i.e.*, the money laundering conspiracy charge, on January 4, 2023 in conjunction with the filing of a signed plea agreement. *See* Dkt. Nos. 42-43.

### III. GUIDELINES CALCULATION

The plea agreement sets forth the calculations that the parties agree are applicable in this case. *See* Dkt. No. 43 ¶ 7. Specifically, the parties agree that the following calculations determine the defendant's Offense Level:

    a.    Base Offense Level, U.S.S.G. § 2S1.1(a)(2)     12

|   |   |   |   |
|---|---|---|---|
|   |   | Base offense level is 8 plus the number of offense levels from the table in U.S.S.G. § 2B1.1, which is 4 because the loss amount is $33,620.  See U.S.S.G. § 2B1.1(b)(1)(C). |   |
|   | b. | U.S.S.G. § 2S1.1(b)(2)(B) <br> Defendant was convicted of a violation of 18 U.S.C. § 1956 | + 2 |
|   | c. | Acceptance of Responsibility: | - 2 |
|   | d. | Adjusted Offense Level: | 12 |

The parties agree that the defendant's Criminal History Category is I. The U.S. Probation office also agrees that the defendants Offense Level is 12, and that her Criminal History Category is I.

### IV.  APPLICABLE LAW

The United States Sentencing Guidelines serve as "the starting point and the initial benchmark" of the sentencing process and are relevant throughout the entirety of the sentencing proceedings. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (quoting *United States v. Kimbrough*, 522 U.S. 85, 108 (2007)). The overarching goal of sentencing, as set forth by Congress, is for the Court to "'impose a sentence sufficient, but not greater than necessary' to reflect" the goals set out by Congress in the relevant sentencing statutes. *Carty*, 520 F.3d at 991 (citing 18 U.S.C. § 3553(a)). In accomplishing that goal, the Court should, after calculating the defendant's Guidelines sentencing range, consider the factors set forth under 18 U.S.C. § 3553(a), to wit: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need for the sentence imposed to afford adequate deterrence to criminal conduct; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### V.  SENTENCING RECOMMENDATION

The government respectfully submits that a custodial sentence at the low end of the Guidelines is sufficient, but not more than necessary, to achieve the goals of sentencing set forth by statute. Although the defendant did not directly engage in drug trafficking activity, she was enormously helpful in

enabling Ponce's drug trafficking infrastructure. Businesses like the defendant's MSB enable cheap and simple cross-border transactions that grease the wheels of a drug trade with profound impacts on the San Francisco Bay Area and other metropolitan areas across the United States. A Guidelines sentence would reflect the seriousness of the offense and would reflect the danger wrought by allowing businesses that facilitate drug trafficking activity to flourish. Such a sentence would promote respect for the law, and serve as a just punishment for the defendant's violation.

Moreover, a sentence that includes a term of custody would have a general deterrent effect on the other individuals operating MSBs. Upon the institution of shelter-in-place protocols at the beginning of the COVID-19 pandemic, a wave of small businesses began offering services similar to those the defendant provided to Ponce because of the difficulty bulk cash smugglers faced while crossing the U.S.-Mexico border. A sentence that includes custodial time would ensure that individuals who assist drug trafficking organizations by providing them with access to money transferal services would not receive lesser sentences than bulk cash smugglers simply because the nature of working in an MSB is more ministerial than the work of smugglers. A deterrent effect would be even more impactful now as civilians become more and more knowledgeable about the effects of the ongoing fentanyl crisis and the infrastructure that supports it.

The government acknowledges that there are factors militate against imposing a custodial sentence. Perhaps most immediately pressing is the defendant's recent history of health problems. The government notes that custodial facilities would be able to care for the defendant during her custodial term. Moreover, because the bottom of the Guidelines range reflects a relatively short term of incarceration, the defendant would be able to resume her course of treatment with her normal medical team in short order. The government also recognizes the defendant's past and its potential impact on her choices in recent years. The government understands that the defendant's past traumas will, and should, be considered in determining an appropriate sentence for the defendant, and that these factors weigh in favor of a lessened sentence. But when taking all of the sentencing factors into account, the government still believes that the Court should sentence the defendant to custodial time. The defendant's prior trauma, while impactful, cannot excuse the defendant's use of the international financial system to

5
U.S. SENTENCING MEMORANDUM
Case No. 3:21-CR-0257 EMC

support activity that she knew was criminal, but that she chose to facilitate anyway. A relatively brief term of imprisonment would reflect the seriousness of the offense, the need for deterrence, and the need for just punishment, while also reflecting the defendant's nature and personal circumstances.

With respect to the other circumstances of the defendant, those too weigh in favor of imposing a term of custody. Notwithstanding the defendant's lack of knowledge as to the precise specified unlawful activity for which she laundered money, the fact remains that the defendant pressed forward with conduct that she knew was indicative of money laundering even after her ability to process transactions terminated. She knew which money services businesses were to be avoided because they were "delicate," and which she could expect to use with little resistance. She brazenly used false information to process transactions, indicating that she had little respect for the law or her anti-money laundering training. All of these facts demonstrate that the imposition of a term of custody is necessary, and not more than sufficient, to achieve the goals of sentencing in this particular case.

With respect to the other aspects of the defendant's sentence, the government agrees with U.S. Probation that the Court should sentence the defendant to three years' supervised release and a $100 mandatory special assessment. The imposition of a term of supervised release would help ensure that the defendant continues leading a law-abiding life after the resolution of this case, so long as the Court imposes the conditions that the U.S. Probation Office recommends in the Presentence Investigation Report.

## VI.    CONCLUSION

For the reasons stated above, the government respectfully requests that the Court impose a term of custody at the low end of the applicable Guidelines range with a term of supervision to follow.

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

DATED:    May 10, 2023

　　　　　/s/　　　　　　　　　
CHRIS KALTSAS
Assistant United States Attorney